**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

LEE ANN PARKER,                                     Case No. 1:18-cv-556

        Plaintiff,                                     Dlott, J.
                                             Bowman, M.J.
     v.

COMMISSIONER OF SOCIAL SECURITY,

        Defendant.

## REPORT AND RECOMMENDATION

Plaintiff Lee Ann Parker filed this Social Security appeal in order to challenge the Defendant's finding that she is not disabled. *See* 42 U.S.C. §405(g). Proceeding through counsel, Plaintiff asserts three claims of error. As explained below, I conclude that the ALJ's decision should be REVERSED, because it is not supported by substantial evidence in the record as a whole.

### I.  Summary of Administrative Record

The record reflects that Plaintiff has filed applications seeking social security benefits on multiple prior occasions, all of which applications have been denied. This appears to be her first judicial appeal.

Records pertaining to earlier applications are limited. (Tr. 130, reflecting first application filed in November 2005 and a second application filed in January 2007). Her second application was denied by an Administrative Law Judge ("ALJ") in October 2009. (*Id.*; *see also* Tr. 107). Plaintiff filed new applications for disability insurance benefits

("DIB") and for supplemental security income ("SSI"), which were denied by Administrative Law Judge ("ALJ") Grippo on July 19, 2012. (Tr. 100; *see also* Tr. 130).

In lieu of a judicial appeal, Plaintiff filed a new SSI application in August 2012, alleging a disability onset date beginning August 10, 2012. (Tr. 130). That application also was denied initially and upon reconsideration. Following an evidentiary hearing at which Plaintiff was represented by the same counsel appearing herein, ALJ Dillon issued an unfavorable written decision on January 10, 2014. (Tr. 100-120). The Appeals Council denied Plaintiff's request for further review. (Tr. 18, 125-129).

Once again, Plaintiff filed a new SSI application alleging disability beginning January 11, 2014. That application again was denied initially and upon reconsideration. On January 5, 2018, Plaintiff appeared at an evidentiary hearing with counsel, and gave testimony before Administrative Law Judge ("ALJ") Michael Schmitz; Plaintiff's significant other and a vocational expert also testified. On February 5, 2018, ALJ Schmitz issued a new adverse written decision, (Tr. 18-33), from which Plaintiff now appeals to this Court.

Plaintiff was 39 years old when she filed her most recent application for benefits, and was within the same age "younger individual" category, at 42 years old, on the date of ALJ's Schmitz's decision. She has a high school education, and past relevant work as an automobile mechanic, a skilled job that she performed at the medium exertional level. (Tr. 32). She lives in a ranch-style house with her long-term boyfriend. (Tr. 54-55). Plaintiff testified that she became disabled after she injured her back at work in 2005. (Tr. 57; *see also* Tr. 20).

The ALJ determined that Plaintiff has severe impairments of: "degenerative disc disease, herniated disc and spinal stenosis of the lumbar spine with radiculopathy and sciatica, bilateral carpal tunnel syndrome; fibromyalgia; systemic lupus erythematosus;

bipolar disorder, depression, panic disorder and posttraumatic stress disorder (PTSD)." (Tr. 20). The ALJ found additional "non-severe" impairments of a "history of skin cancer, dermatitis, unspecified neoplasm and skin ulcer, mitral regurgitation, mitral valve prolapse, valvular heart disease, coronary artery disease, arteriosclerotic heart disease and palpitations, venous insufficiency, hypotension, hypertension, hyperlipidemia, hypercholesteremia, dyspnea, headache, sleep disorder, urinary incontinence, and bereavement." (Tr. 21). Plaintiff does not dispute the ALJ's determination that none of her impairments, either alone or in combination, met or medically equaled any Listing in 20 C.F.R. Part 404, Subpart P, Appendix 1, such that Plaintiff would be entitled to a presumption of disability. (Tr.22).

ALJ Schmitz agreed that Plaintiff cannot perform her past work. Although the prior ALJ had determined that Plaintiff retained the residual functional capacity ("RFC") to perform only a limited range of sedentary work with standing/walking no more than 2 hours per day, (Tr. 106), ALJ Schmitz did not consider himself bound by that determination based on new and material evidence. Thus, instead of restricting Plaintiff to sedentary work, ALJ Schmitz found Plaintiff retained the RFC to perform a restricted range of light work, involving lifting up to 20 pounds, and with fewer postural limitations than determined in 2014. ALJ Schmitz excluded other physical limitations previously included in the 2014 decision,[1] but added some mental limitations as follows:

> [T]he claimant could occasionally climb ramps and stairs, occasionally stoop, crouch and crawl. She could never climb ladders, ropes or scaffolds. She could frequently balance and kneel. She could occasionally reach overhead with the bilateral upper extremities but frequently reach in all other directions. She could frequently handle and finger with the bilateral upper

---

[1] For example, ALJ Dillon restricted Plaintiff to no more than occasional lifting or carrying small files or tools, with an option every 45 minutes to stand up for 2-3 minutes at the workstation, no crawling, and no left foot pedal operation.

extremities. She should avoid concentrated exposure to vibrations, and avoid all exposure to hazards such as unprotected heights, moving mechanical parts and operation of motor vehicles. She could perform simple, routine and repetitive tasks, but not at a production rate pace such as assembly line work. She could interact on an occasional basis with supervisors and coworkers in a non-public setting with incidental interaction with the general public, and should be limited to superficial contact meaning no sales, arbitration, negotiation, conflict resolution, group tasks, or management or direction of others. She could respond appropriately to occasional change in a routine work setting as long as any such changes were easily explained and/or demonstrated in advance of gradual implementation.

(Tr. 23).

Considering Plaintiff's age, education, and RFC, and based on testimony from the vocational expert, the ALJ determined that Plaintiff could still perform a "significant number" of jobs in the national economy, including the representative jobs of ticket marker, cleaner of offices, and garment sorter. (Tr. 33). Therefore, the ALJ determined that Plaintiff was not under a disability. The Appeals Council denied Plaintiff's request for review, leaving the ALJ Schmitz's decision as the final decision of the Commissioner.

In her judicial appeal, Plaintiff asserts that the ALJ erred: (1) by failing to defer to the opinions of her treating physicians; (2) by improperly assessing her pain and other subjective complaints; and (3) by failing to address the credibility of the testimony of her boyfriend. The undersigned agrees that the ALJ committed legal error, which prevents his decision from being affirmed by this Court.

## II. Analysis

### A. Judicial Standard of Review

To be eligible for benefits, a claimant must be under a "disability." *See* 42 U.S.C. §1382c(a). Narrowed to its statutory meaning, a "disability" includes only physical or mental impairments that are both "medically determinable" and severe enough to prevent the applicant from (1) performing his or her past job and (2) engaging in "substantial

gainful activity" that is available in the regional or national economies. *See Bowen v. City of New York*, 476 U.S. 467, 469-70 (1986).

When a court is asked to review the Commissioner's denial of benefits, the court's first inquiry is to determine whether the ALJ's non-disability finding is supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (additional citation and internal quotation omitted). In conducting this review, the court should consider the record as a whole. *Hephner v. Mathews*, 574 F.2d 359, 362 (6th Cir. 1978). If substantial evidence supports the ALJ's denial of benefits, then that finding must be affirmed, even if substantial evidence also exists in the record to support a finding of disability. *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994). As the Sixth Circuit has explained:

> The Secretary's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion.... The substantial evidence standard presupposes that there is a 'zone of choice' within which the Secretary may proceed without interference from the courts. If the Secretary's decision is supported by substantial evidence, a reviewing court must affirm.

*Id.* (citations omitted).

In considering an application for supplemental security income or for disability benefits, the Social Security Agency is guided by the following sequential benefits analysis: at Step 1, the Commissioner asks if the claimant is still performing substantial gainful activity; at Step 2, the Commissioner determines if one or more of the claimant's impairments are "severe;" at Step 3, the Commissioner analyzes whether the claimant's impairments, singly or in combination, meet or equal a Listing in the Listing of Impairments; at Step 4, the Commissioner determines whether or not the claimant can still perform his or her past relevant work; and finally, at Step 5, if it is established that

5

claimant can no longer perform his or her past relevant work, the burden of proof shifts to the agency to determine whether a significant number of other jobs which the claimant can perform exist in the national economy. *See Combs v. Commissioner of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006); 20 C.F.R. §§404.1520, 416.920.

A plaintiff bears the ultimate burden to prove by sufficient evidence that she is entitled to disability benefits. 20 C.F.R. § 404.1512(a). A claimant seeking benefits must present sufficient evidence to show that, during the relevant time period, she suffered an impairment, or combination of impairments, expected to last at least twelve months, that left her unable to perform any job. 42 U.S.C. § 423(d)(1)(A).

### B. Relevant Medical Evidence

As stated, Plaintiff has not worked since 2005. In the 2014 adverse decision (the last decision prior to the 2018 decision that forms the basis for this appeal), her "severe" impairments were listed as including an unspecified spine disorder, an unspecified affective disorder, anxiety-related disorder, pain disorder, and carpal tunnel syndrome, with additional "non-severe" impairments of left hip and knee pain for which the ALJ added a limitation relating to the use of her left foot. (Tr. 102, 106). By 2018, her list of severe impairments had grown significantly. In addition to the previously referenced disc disease and bilateral carpal tunnel syndrome, her conditions now include "herniated disc and spinal stenosis of the lumbar spine with radiculopathy and sciatica, fibromyalgia, systemic lupus erythematosus, bipolar disorder, depression, panic disorder and posttraumatic stress disorder (PTSD)." (Tr. 20).

Although the medical records contained in this judicial appeal are limited to the relevant disability period of January 2014 through the date of ALJ Schmitz's decision, the administrative record also contains extensive analysis by ALJ Dillon of earlier records,

6

which provide context for Plaintiff's current claims. ALJ Dilllon's decision noted that Plaintiff had been prescribed a significant amount of pain medication over the years, most often by her long-term primary care physician, Dr. Jarrett. In fact, as of the date of ALJ Dillon's 2014 decision, the only treatment Plaintiff had received for her allegedly severe pain was from Dr. Jarrett. (Tr. 108). At the time of the 2014 hearing, she was being prescribed morphine, as well as many other drugs. (Tr. 109). Between 2012 and 2014, psychiatrists and mental health providers expressed concerns with the "unsafe" and "dangerous" combination of medications that had been prescribed, and noted Plaintiff's frequent presentation of being over-medicated as well as her possible addiction to prescription pain medications. (Tr. 110-111; *see also* Tr. 112 (testimony from plaintiff's boyfriend that Dr. Jarrett had been overprescribing her medication for a long time)). Plaintiff's severely impaired appearance at multiple mental health sessions prompted her psychiatrist to call Dr. Jarrett's office to discuss her medications, but those calls went unreturned. (Tr. 111). ALJ Dillon discussed many records that suggested significant concern with Dr. Jarrett's decision to prescribe high levels of pain medications while continuing conservative treatment, without referrals for surgery, chiropractic therapy, physical therapy, or a pain management specialist. (Tr. 112-113). Although ALJ Dillon ultimately concluded that Plaintiff's combination of physical and mental impairments was not disabling, he suggested that Plaintiff's prescription medications were exacerbating her already-severe psychological symptoms and impairments. (Tr. 114).

At the hearing more than four years later before ALJ Schmitz, Plaintiff testified to continuing to use prescribed morphine three times per day through August 2016, with a corresponding limitation of her driving privileges until she discontinued morphine. Throughout the time she was taking morphine, Plaintiff testified that significant side

effects including unsteadiness on her feet, cognitive issues, and slurring of her words. (Tr. 74-75). Unlike the record before ALJ Dillon, which reflected few referrals for Plaintiff's pain complaints, the medical record before ALJ Schmitz reflected an apparent increase in symptoms, diagnostic testing, and treatment modalities beginning in 2014, including significant back surgery in December 2016.

Most of the relevant records were accurately summarized by ALJ Schmitz. For the Court's convenience, the undersigned primarily cites to his opinion. Plaintiff sought additional Emergency Room treatment in July 2014 and in January 2015 related to her reports of falling and back pain with radiation. (Tr. 25). She underwent epidural blocks on November 18, 2014, January 9, 2015, and January 22, 2015 with only 50% relief. (*Id.*) An MRI dated February 4, 2015 showed central disc protrusions at the L4-5 and L5-S1 levels, with bilateral nerve root involvement at L5 and S1, more significant at the L5-S1 level with some posterior lateral displacement of the left S1 nerve root. (*Id.*; *see also* Tr. 385-398). Plaintiff was observed to have an antalgic gait on January 20, 2015, and on February 23, 2015, along with other with positive straight leg findings and difficulty heel-toe walking noted in February. (Tr. 26). A spine specialist to whom Plaintiff had been referred, Dr. Smail, ordered an EMG of the left lower extremity, but that EMG did not reveal any abnormality in her left leg. (*Id.*) After reviewing test results, Dr. Smail discussed elective surgery and advised Plaintiff to quit smoking; Plaintiff said she was not yet ready for surgery. (*Id.*)

Plaintiff returned to the ER on October 30, 2015 with renewed complaints of left hip pain after falling, but she was discharged home after no acute abnormalities were noted. In April 2016, Plaintiff was seen by Dr. Probst at Orthopedic Associates with sharp lower back pain, pain down her left leg, and intermittent diffuse numbness. (Tr. 27). She

obtained minimal relief from aquatic therapy and a Medrol Dosepak, with moderate relief from morphine. Dr. Probst ordered another MRI on May 19, 2016, which showed mild disc bulges with posterior central protruding disc herniations at L4/L5 and L5/S1, mild central spinal canal stenosis at the same levels, and several other findings indicating nerve root involvement. (*Id.*) Dr. Probst recommended that Plaintiff stop morphine and proceed with surgery. Plaintiff again presented to the ER in August 2016 with back pain, at which time she underwent a discogram of the lumbar spine that was positive at L4-5 and L5-S1. She stopped morphine and thereafter scheduled surgery. (*Id.*)

On December 19, 2016 and again on December 22, 2016, Plaintiff underwent a significant two-stage spinal lumber fusion surgery involving the L4-5 and L5-S1 levels. Plaintiff was discharged home on December 24, 2016. During a postoperative visit on January 24, 2017, her surgical incisions were healing well. (*Id.*) Her gait was still antalgic, but she had unrestricted flexion, extension and lateral bend as well as forward flexion and extension with normal lumbar motion. She returned for follow up on February 14, 2017 with complaints of bilateral lower extremity numbness and pain but was off prescription pain medications at that time. (*Id.*) Despite continuing complaints of numbness, Plaintiff's records reflect improvement of her low back pain throughout 2017. During a physical therapy session on April 19, 2017, she rated her pain as one out of 10 and reported that she had been released to work. (Tr. 28, citing D48F, 22) The ALJ further noted records in the spring of 2017 indicated that Plaintiff had been able to work in her yard, could walk around a grocery store independently and lift and carry groceries, could lift and carry laundry to the washing machine, clean the bathroom, vacuum, sweep, and pick items up off the floor. (*Id.*)

At some point, based on her continued issues with falling and/or her mental impairments, Plaintiff obtained a service dog. The record reflects a certificate of registration and another registration document (date illegible) for a Great Dane identified as "Chleo." (Tr. 314-315). In October 2017, after Plaintiff continued to report numbness in her thigh and discomfort in her fingers and toes, Dr. Jarrett conducted additional blood testing and diagnosed Plaintiff with systemic lupus erythematosus. (Tr. 28).

ALJ Schmitz cited the May 2015 EMG as evidence that Plaintiff could ambulate at the "light" exertional range, as well as Dr. Smail's notes that Plaintiff's primary complaints were with her low back. (Tr. 26). However, the ALJ at least partially misstates the record in this regard. It is true that Plaintiff's reported most of her severe *pain* as radiating from her low back. However, she also reported pain in both buttocks and legs, and weakness and numbness in her legs. (Tr. 903). The ALJ either misunderstood or ignored the fact that Plaintiff continued to report leg pain as well as numbness and weakness that she alleges continued to cause her instability and difficulty with ambulation. The ALJ also characterized the EMG as supporting Plaintiff's ability to ambulate at the light exertional level with no "neurological abnormality in her lower *extremities*," (*id.*), when in fact that study was limited to her left leg. (Tr. 906-909). Both prior to and for some period following her December 2016 surgery, the record reflects that Plaintiff had an antalgic gait and reported difficulty with ambulation, including unexplained numbness and frequent falls. The ALJ did not discuss the referenced records in any detail.

Instead, ALJ Schmitz emphasized that after her most recent December 2016 surgery and physical therapy, Plaintiff recovered well, attaining both significant improvement in terms of her physical functioning, and a significant decrease in her reported pain level. Again, however, the record reflects that despite that decrease in

pain, Plaintiff reported continuing problems with leg numbness and balance, and was subsequently diagnosed with lupus, a diagnosis for which the ALJ assessed no particular limitations. The ALJ also did not assess any limitations to Plaintiff's fibromyalgia, which she testified "overlap[ped]" with the pain from her lupus. (Tr. 64). Plaintiff testified that she uses her service dog to assist her with balance, but the ALJ made no mention of that record.[2] Instead, the ALJ found Plaintiff able to ambulate freely without restrictions, noting that "clinical examinations and diagnostic studies do not support an inability to ambulate without assistance and improvement of her condition following surgical intervention." (Tr. 25).

### C. Plaintiff's Claims of Error

#### 1. The ALJ's Rejection of Two Treating Physicians

The medical opinion evidence during the relevant disability period at issue included opinions from two treating physicians, as well as opinions from non-examining agency reviewers. Plaintiff first seeks reversal on grounds that the ALJ erred in failing to adopt the opinions of her two treating physicians, and instead overly relied upon state agency consultants who lacked access to two years' worth of Plaintiff's records. I agree that the rejection of the treating physician opinions is not supported by substantial evidence.

The relevant regulation concerning the opinions of treating physicians, 20 C.F.R. § 404.1527(c)(2), provides: "[i]f we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight." *Id.; see*

---

[2] It is unclear when, or by whom (if anyone) the dog was recommended or prescribed, or the extent to which Plaintiff claims need of the dog in a work environment.

*also Warner v. Com'r of Soc. Sec.,* 375 F.3d 387, 390 (6th Cir.2004). The treating physician rule[3] requires "the ALJ to generally give greater deference to the opinions of treating physicians than to the opinions of non-treating physicians." *See Blakley v. Com'r of Social Security,* 581 F.3d 399, 406 (6th Cir.2009).

The reasoning behind the rule has been stated as follows:

> [T]hese sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of the claimant's medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.

*Wilson v. Com'r of Social Security,* 378 F.3d 541, 544 (6th Cir.2004) (quoting former 20 C.F.R. § 404.1527(d)(2)).

Despite the presumptive weight given to the opinions of the treating physician, if those opinions are not "well-supported" or are inconsistent with other substantial evidence, then the opinions need not be given controlling weight. Soc. Sec. Ruling 96–2p, 1996 WL 374188, at *2 (July 2, 1996). In such cases, the ALJ should review additional factors to determine how much weight should be afforded to the opinion, such as "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and any specialization of the treating physician." *Blakley,* 581 F.3d at 406; *see also* 20 C.F.R. § 404.1527(c)(2).

---

[3] Effective March 27, 2017, many long-standing regulations have been significantly revised or rescinded, with the old hierarchy discarded. For example, a new rule set forth in 20 C.F.R. § 404.1520c entirely replaces the treating physician rule. Although some revisions apply to claims that were on March 27, 2017, the Commissioner has made clear that the elimination of the treating physician rule applies only to "claims filed on or after March 27, 2017." *See* Social Sec. Admin., *Revisions to Rules Regarding the Evaluation of Medical Evidence,* 82 Fed. Reg. at 5845. Based on the date that Plaintiff filed her claim in this case, the "treating physician rule" and related SSRs and case law continue to apply here. *Accord, Glanz v. Com'r of Soc. Sec.,* 2018 WL 3722318 at n. 5 (N.D. Ohio July 17, 2018).

When the treating physician's opinion is not given controlling weight, the ALJ must provide "good reasons" for doing so. *Id.* Good reasons "must be supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Blakley,* 581 F.3d at 406-407; *see also* Soc. Sec. Rul. 96–2p. An ALJ's failure to provide an adequate explanation for according less than controlling weight to a treating source may only be excused if the error is harmless or de minimis, such as where "a treating source's opinion is so patently deficient that the Commissioner could not possibly credit it." *Blakley,* 581 F.3d at 409 (quoting *Wilson,* 378 F.3d at 547).

### a. Jeffery Jarrett, M.D.

Jeffrey Jarrett, M.D., is Plaintiff's primary care physician. The undersigned concludes that the reasons provided by the ALJ are insufficient to satisfy the "good reasons" standard for the rejection of his opinions on the record presented.

Dr. Jarrett has an unusually long treatment relationship with Plaintiff. Plaintiff testified that she first saw him the age of 8; a form completed by Dr. Jarrett states that he has seen her every 2 to 6 months for more than 20 years. (Tr. 1515). Relevant to the current disability application,[4] Dr. Jarret offered his RFC opinions in May 2017, after Plaintiff's December 2016 back surgery but prior to his diagnosis of lupus.

---

[4] In support of her prior application, Dr. Jarrett opined that he "felt very strongly" that Plaintiff should be granted disability benefits and offered similar work-preclusive RFC opinions, to which a prior ALJ also gave "little weight." (Tr. 116-117). Although ALJ's Dillon's adverse decision was not (and is not) the subject of appeal, the undersigned notes that he provided much more extensive reasons for rejecting Dr. Jarrett's opinions at that time than provided in the 2018 decision.

In his May 2017 report, Dr. Jarrett opines that Plaintiff has chronic moderately severe bipolar disorder, "which makes/adds to …multiple areas of pain" including pain in her low back, neck, shoulders, wrists and hands. (*Id.*) Based on her combined diagnoses of "chronic back pain, fibromyalgia (multiple areas) and her moderately severe bipolar disorder," he opines she was "absolutely/totally unable to perform any type of sustained employment." (Tr. 1518).[5] Dr. Jarrett's RFC opinions are extensive and reflect extreme limitations. Although some are consistent with the sedentary RFC level determined by the ALJ in 2014, many others would be work-preclusive.

For example, Dr. Jarrett states that she can sit for 45 minutes at a time or 2 hours total in a work-day, stand for 20 minutes at a time, and stand/walk less than 2 hours in a workday. (Tr. 1516). He further opines that she could walk only for one-half block without rest or severe pain, but would need to walk for 10 minutes every 45 minutes throughout the 8-hour day. (Tr. 1516-1517). In addition, Dr. Jarrett opines that Plaintiff would need unscheduled breaks of 10-15 minutes every 30-45 minutes throughout the workday. (Tr. 1517). He states she could occasionally lift/carry less than 10 pounds, and could never lift or carry more. (Tr. 1517). He opines that she has significant limitations in repetitive reaching, handling or fingering, and could not use either right or left hands/fingers/arms for repetitive activities more than 10% of the day. (Tr. 1518). He further opines she could never bend and twist at the waist. (*Id.*). Finally, he opines that she would be absent from work more than three times per month. On a second form, dated August 16, 2017 and signed December 12, 2017, Dr. Jarrett reiterates his opinion that Plaintiff is unable to perform any type of work-related tasks. (Tr. 1768). He states that she needs low stress,

_____

[5] Although records suggest that Plaintiff also is obese, Dr. Jarrett's opinions do not reference her obesity.

cannot do "any repeat type bending, standing, lifting," has "limited concentration ability and cannot handle a work environment." (*Id.*)

The ALJ acknowledged Dr. Jarrett's status as a treating physician, but declined to give his RFC opinions controlling weight, instead giving them only "some weight" after succinctly dismissing them as "not consistent with the evidence or clinical examinations." (Tr. 31). Specifically, the ALJ found Dr. Jarrett's opinion concerning Plaintiff's inability to bend or twist to be inconsistent with one physical examination in which he reported that despite moderate tenderness and limited extension and flexion in her lower spine (with specific measurements provided), her ability to twist was "fairly normal." (Tr. 31, citing Tr. 1526). The ALJ's finding on the ability to twist does not explain, however, how Plaintiff would have been able to have full range of motion and twisting abilities prior to her December 2016 surgery, nor does he provide sufficient reasons for rejecting virtually *all* of Dr. Jarrett's opinions wholesale. For example, although Dr. Jarrett's opinion on the amount of weight that Plaintiff could lift and carry was consistent with the sedentary exertional level determined in 2014, and the medical records suggested a worsening of Plaintiff's degenerative spine conditions prior to the December 2016 surgery, ALJ Schmitz drew no distinction between the pre- and post-surgical periods. The opinion offers little hint – other than by reference to 2017 post-surgical records – of what "new and material" evidence would support the decision to reject Dr. Jarrett's exertional limitations and instead find that Plaintiff's physical RFC had substantially improved since 2014 such that she could perform at the light level without postural limitations.[6]

---

[6] The two non-examining agency consultants cited an opinion by Gary Brown, M.D. dated June 22, 2015, to depart from the 2014 RFC findings. Dr. Brown appears to have been a cardiologist who evaluated Plaintiff's cardiac complaints, which are admittedly non-severe. It is unclear whether Dr. Brown evaluated other physical impairments as the undersigned was unable to locate Dr. Brown's RFC opinion(s).

The ALJ discounted Dr. Jarrett's opinions concerning Plaintiff's upper extremity limitations because he believed that Dr. Jarrett's failure to refer Plaintiff for any further neurodiagnostic studies to be inconsistent with his finding of a positive Tinel's sign and opinion that she could use her hands a mere 10% of the time. (Tr. 31).  However, the record reflects that Plaintiff had previously been diagnosed with carpal tunnel syndrome after nerve studies, and that she previously had undergone prior bilateral carpal tunnel release surgery in 2013.  While improving her condition at that time, the 2013 surgery did not return her to 100%   On April 13, 2017, Dr. Jarrett noted Plaintiff was once again exhibiting a positive Tinel's sign bilaterally and recommended "more aggressive treatment and referral for carpal tunnel [surgery] when she is willing to get this performed."  (Tr. 1524).  Four months out from her extensive two-stage back surgery, the record does not support the ALJ's characterization of Dr. Jarrett's opinion as inconsistent with his failure to refer Plaintiff for more aggressive treatment for her carpal tunnel syndrome.  In addition, there is an indication in Dr. Jarrett's records that he believes Plaintiff's lupus and/or fibromyalgia impact her upper extremities.

The ALJ also discounted Dr. Jarrett's assessment of "mental limitations" on grounds that "he is not a psychiatrist or psychologist." (Tr. 31).  Dr. Jarrett referenced Plaintiff's bipolar disorder, and opined that she had limited concentration and would need "low stress."  In fact, those opinions appear to have been accommodated by the ALJ.  The only other "mental" opinion offered by Dr. Jarrett was that her physical complaints and limitations are exacerbated by her mental impairments.  Considering the unusual length and frequency of the treatment relationship he held with Plaintiff, the undersigned does not view that opinion to be grounds for rejecting virtually all of Dr. Jarrett's opinions. *See Walker v. Secretary of Health and Human Services,* 980 F.2d 1066 (6th Cir.

1992) (reversing non-disability finding where ALJ failed to consider combined effect of plaintiff's back injury and depression).

In sum, remand is required because the ALJ failed to adequately consider the differences between Plaintiff's pre- and post-surgical records, and the justification provided by the ALJ does not constitute "good reasons" for the wholesale rejection of all of Dr. Jarrett's opinions on the record presented. While the ALJ may yet reject some of Dr. Jarrett's opinions on remand,[7] the overall physical RFC as determined cannot be affirmed as substantially supported throughout the disability period at issue.

Finally, Plaintiff further argues that the ALJ's decision to give even "partial" weight to the physical RFC opinions of the agency reviewers, who lacked access to more than two years' worth of medical records (including Dr. Jarrett's RFC opinions) is not substantially supported. Plaintiff protests that the reviewers were unaware of the severity of Plaintiff's back disease and other recently diagnosed impairments. (*See* Tr. 144, 162). Plaintiff complains that despite noting significant documentation submitted in the record after the assessments of the two agency reviewers, the ALJ made only modest, insignificant changes to the 2015 RFC assessments. I agree that on remand, the ALJ should reconsider the weight given to these opinions, and should better articulate the basis for adopting, rejecting, or modifying them. *See Blakley,* 581 F.3d at 406-409; *Gayheart v. Com'r of Soc. Sec.*, 710 F.3d 365, 375-377 (6th Cir. 2013).

---

[7] The fact-specific nature of this Court's review of the ALJ's stated reasons for rejecting a treating physician's opinions is illustrated by reference to other cases involving Dr. Jarrett. *See, e.g., Myers v. Com'r of Soc. Sec.*, 2015 WL 4651240 (S.D. Ohio July 15, 2015) (affirming rejection of Dr. Jarrett's opinions); *Shively v. Com'r of Soc. Sec.*, 2014 WL 7653637 (S.D. Ohio Dec. 22, 2014); *Sturgill v. Astrue*, 2010 WL 715672 (S.D. Feb. 23, 2010); *but see Banks v. Com'r of Soc. Sec.*, 2015 WL 4881575 (S.D. Ohio Aug. 15, 2015) (holding that rejection of Dr. Jarrett's opinions did not comport with law).

### b. Dr. Baula

The ALJ committed similar errors with respect to a mental residual functional capacity questionnaire completed by Plaintiff's therapist, credentials, and co-signed by her psychiatrist, Dr. Baula, on March 11, 2015. (Tr. 408-415). The assessment describes Plaintiff as having marked to extreme limitations in multiple areas based in part on an increase in symptoms "in the past 13 months due to experienced trauma during 2014." (Tr. 412, referring to a rape). The ALJ brushed aside the opinions on grounds that the "evidence does not support the severity of limitations assessed by Ms. Downs regarding the claimant's mental health," reasoning that Plaintiff "did not require inpatient treatment nor did Dr. Baula or Ms. Downs refer [her]…for inpatient psychiatric treatment." (Tr. 31). To the extent that the ALJ implies that one cannot have disabling mental limitations without being psychiatrically hospitalized, such reasoning is in error.

The ALJ also states that "Ms. Downs is not an acceptable medical source and overstates limitations." (*Id.*) However, Dr. Baula, a treating psychiatrist, co-signed and endorsed the same RFC opinions.[8] The ALJ suggested that the opinion that Plaintiff "has difficulty getting along with others" was inconsistent with Plaintiff's ability to "maintain[] a relationship with her significant other." Yet, a 16-year relationship with a live-in boyfriend is not necessarily inconsistent with the referenced opinion. (Tr. 1499, reporting she has co-habited with friend since 2001). The undersigned also finds problematic the ALJ's

---

[8] Although technically correct as to Ms. Downs, an opinion rendered by a therapist that has been co-signed by a physician who is part of the same treatment team is arguably entitled to controlling weight. It is also worth noting that SSR 06-03P, 2006 WL 2329939 concerning the definition of an "acceptable medical source" has been rescinded but continues to apply to this case. "[I]n claims filed on or after March 27, 2017, the final rules state that all medical sources, not just acceptable medical sources, can make evidence that we categorize and consider as medical opinions." *Rescission of Social Security Rulings 96-2p, 96-5p, and 06-3p*, 82 FR 15263-01

dismissal of Dr. Baula's opinions on grounds that they were "largely based on the claimant's report of what she thought she could do rather than his clinical assessment." (Tr. 31, citing Tr. 962-979, without reference to Dr. Baula's co-signed RFC assessment dated 3/13/15). Without more, such a conclusory statement does not constitute a good reason for rejecting a treating psychiatrist's opinions. *Winning v. Comm'r of Soc. Sec.*, 661 F. Supp. 2d 807, 821 (N.D. Ohio 2009) (noting that "psychology and psychiatry are, by definition, dependent on subjective presentations by the patient").

The ALJ's reference to an inconsistency between the therapist's opinion that Plaintiff was withdrawn from the public and her ability to take public transportation is only slightly more persuasive, because the questionnaire explains that Plaintiff "needs trusted companion for assistance to leave home." (Tr. 31; *see* Tr. 412). Only the ALJ's reference to Plaintiff's GAF scores of 55 and 67, which suggest no more than moderate symptoms, provide clear support for a conclusion that her mental symptoms are less than disabling. Thus, while it remains possible that additional review on remand may find valid reasons to reject the opinions of Plaintiff's treating psychiatrist and therapist, the reasons stated on the record presented do not constitute good reasons.

## 2. The Assessment of Subjective Symptoms

Plaintiff's second and third assertions of error challenge the ALJ's assessment of her testimony and that of her supporting witness, Christopher Ward. The ALJ made an adverse assessment of Plaintiff's subjective complaints, stating that "the degree of limitation alleged by the claimant is not fully supported," and that her "statements concerning the intensity, persistence and limiting effects" of her symptoms "are not entirely consistent with the medical evidence and other evidence in the record." (Tr. 24). However, the ALJ's opinion is entirely silent as to his assessment of Mr. Ward. This type

of assessment traditionally has been described as the "credibility" determination, but more recently is better described as a "consistency determination."[9]

It remains the province of the ALJ and not the reviewing court, to assess the consistency of subjective complaints about the impact of a claimant's symptoms with the record as a whole. *See generally Rogers v. Com'r*, 486 F.3d 234, 247 (6th Cir. 2007). Therefore, a reversal of the Commissioner's decision based upon alleged error in a credibility/consistency determination requires a particularly strong showing by a plaintiff. Like the ultimate non-disability determination, the assessment of subjective complaints must be supported by substantial evidence, but "an ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility." *Walters v. Com'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997). Further, a credibility/consistency determination cannot be disturbed "absent a compelling reason." *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001). It is proper for an ALJ to discount the claimant's testimony where there are inconsistencies and contradictions among the medical records, her testimony, and other evidence. *Warner v. Com'r of Soc. Sec.*, 375 F.3d 387, 392 (6th Cir. 2004).

Any error in the ALJ's credibility assessment, standing alone, might not be sufficient to warrant reversal in this case.[10] However, in light of the errors in the evaluation

---

[9] The assessment of symptoms, formerly referred to as the "credibility" determination in SSR 96-7p, was clarified in SSR 16-3p to remove the word "credibility" and refocus the ALJ's attention on the "extent to which the symptoms can reasonably be accepted as <u>consistent</u> with the objective medical and other evidence in the individual's record." SSR 16-3p, 2017 WL 5180304 at *2 (October 25, 2017) (emphasis added). Despite the linguistic awkwardness, courts agree that the prior case law remains fully applicable to the renamed "consistency determination" under SSR 16-3p, with few exceptions. *See Duty v. Com'r of Soc. Sec.*, 2018 WL 4442595 at *6 (S.D. Ohio Sept. 18, 2018).

[10] The Commissioner acknowledges that the ALJ failed to comment on the credibility or consistency of Mr. Ward's testimony, but argues that any error in that regard was not "fatal." (Doc. 9 at 13-14).

of the medical evidence and corresponding impact on the RFC determination, it is appropriate to direct the ALJ to reconsider other aspects of the record including the assessments of Plaintiff's testimony and that of any witnesses.

### III. Conclusion and Recommendation

The referenced errors support further review on remand rather than an immediate award of benefits. *See Faucher v. Secretary of Health and Human Servs.,*17 F.3d 171, 174 (6th Cir.1994). Because the decision is not supported by substantial evidence, **IT IS RECOMMENDED THAT** Defendant's decision be **REVERSED** and remanded for further review under sentence four of 42 U.S.C. §405(g). On remand, the ALJ should: 1) reassess the medical opinion evidence and, if necessary, obtain a new consultative examination and/or non-examining consulting opinion in order to properly determine plaintiff's RFC throughout the referenced disability period; and 2) reassess the consistency of any witness testimony, including but not limited to Plaintiff's testimony and that of any other witnesses.

*/s Stephanie K. Bowman*
Stephanie K. Bowman
United States Magistrate Judge

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

LEE ANN PARKER,                                          Case No. 1:18-cv-556

       Plaintiff,                                          Dlott, J.
                                               Bowman, M.J.
   v.


COMMISSIONER OF SOCIAL SECURITY,

       Defendant.


### NOTICE

Pursuant to Fed. R. Civ. P 72(b), any party may serve and file specific, written objections to this Report and Recommendation ("R&R") within **FOURTEEN (14) DAYS** of the filing date of this R&R. That period may be extended further by the Court on timely motion by either side for an extension of time. All objections shall specify the portion(s) of the R&R objected to, and shall be accompanied by a memorandum of law in support of the objections. A party shall respond to an opponent's objections within **FOURTEEN (14) DAYS** after being served with a copy of those objections. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).